**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| | ) | |
| Catherine Deegan Patterson, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 04-11817 JLT |
| | ) | |
| United States of America, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

_____)

**MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION TO DISMISS**

**INTRODUCTION**

Plaintiffs, Catherine Deegan Patterson, individually and as Administratrix of the Deegan Estate, and Yvonne Deegan Gioka, brought this suit under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq, seeking damages for the alleged wrongful death of their father, Edward "Teddy" Deegan ("Deegan").  The United States has moved to dismiss this action for lack of subject matter jurisdiction because plaintiffs failed to present their administrative claim within two years of accrual as required by statute, 28 U.S.C. § 2401(b), and now the claims are forever barred.  Id.  As shown below, the plaintiffs knew or reasonably should have known of their injury and its cause substantially more than two years before their claims were filed based on the revelations in judicial proceedings and the attendant widespread media publicity. [1]

**FACTUAL BACKGROUND**

_____

[1]When faced with a 12(b)(1) motion to dismiss "[t]he court, without conversion [to a summary judgment standard] may consider extrinsic materials and, to the extent it engages in jurisdictional fact finding, is free to test the truthfulness of the plaintiff's allegations."  Dynamic Image Techs., Inc. v. United Sates, 221 F.3d 34, 37-38 (1st Cir. 2000).

I.      THE ADMINISTRATIVE CLAIM AND THE COMPLAINT

The plaintiffs filed their administrative claim on December 5, 2003[2]. (Compl. at ¶ 8.)

Attached to their administrative claims were "Addendums" stating:

> The facts of this claim are drawn primarily from the findings of Massachusetts
> Superior Court Judge Margaret Hinkle as stated in Commonwealth v. Peter J.
> Limone, 2001 WL 30494 (Mass. Super.)[3]. Certain information in support of this
> claim is also gathered from factual findings of U.S. District Court Judge Mark L.
> Wolf in the case of United States v. Salemme, 91 F.Supp.2d 141 (D. Mass., Sept.
> 15, 1999) and federal documents.

See (Catherine M. (Deegan) Patterson, Standard Form 95 and Addendum to Standard Form 95;

Yvonne (Deegan) Gioka, Standard Form 95 and Addendum to Standard Form 95) (Attached to

the Motion to Dismiss at Tab 1.) The plaintiffs' complaint alleges that the murder of their father,

Edward "Teddy" Deegan, that took place on March 12, 1965, arose in principal part from the

conduct of an FBI informant, Vincent James Flemmi[4] ("Flemmi"). (Compl. at ¶¶ 10, 11.)

Further, on March 9, 1965, an FBI informant advised FBI agents that Flemmi and another FBI

informant, Joseph Barboza ("Barboza"), obtained permission from organized crime figure,

Raymond Patriarca, to kill Deegan. (Compl. at ¶ 13.) The plaintiffs also allege that after the

murder of Deegan, an informant advised the FBI that Flemmi and others killed Deegan. (Compl.

at ¶ 15). The complaint states that the FBI failed to warn Deegan of the planned murder and

---

[2]Plaintiffs' complaint states that the Estate of Edward "Teddy" Deegan, through Attorney
Anthony Cardinale, filed the administrative claim on January 27, 2003. (Compl. at ¶ 7.)
However, this claim was filed by Richard Deegan and was denied in March 2004 because, inter
alia, he was not a duly appointed executor.

[3]This Honorable Court may take judicial notice that Judge Hinkle's unpublished opinion
above was entered on January 8, 2001.

[4]For purposes of the Motion to Dismiss, the United States accepts as true the facts alleged
in the plaintiffs' complaint. Duckworth v. Pratt & Whitney, Inc., 152 F.3d 1, 3 (1st Cir. 1998).

failed to take steps to prevent the murder.  (Compl. at ¶ 17.)

II.    **COURT HEARINGS**

A.    <u>**Salemme**</u>

In 1997, Judge Wolf began a two-year long hearing on Stephen Flemmi's motion to dismiss an indictment charging him with, among other things, multiple charges of racketeering and extortion.  Flemmi claimed that he was effectively immunized by an alleged agreement with certain FBI agents that, because of his informant status, he would not be prosecuted.  This hearing resulted in a thorough investigation of the illicit relationship between certain FBI agents and their informants as far back as the 1960s.  Judge Wolf's opinion on the hearings was issued on September 15, 1999.

The opinion explicitly discussed FBI agents Paul Rico and Dennis Condon's efforts to recruit Barboza as an FBI informant in connection with the investigation of the Deegan murder and Barboza's "extremely valuable" cooperation with the FBI against the La Cosa Nostra organized crime family.  The opinion concluded that, "Barboza's cooperation . . . contributed to the conviction of several Patriarca associates for the murder of Teddy Deegan." <u>Salemme</u>, 91 F.Supp.2d 141, 180.

B.    <u>**Limone**</u>

On January 5, 2001, Massachusetts Superior Court Judge Hinkle conducted an evidentiary hearing on Limone's motion for a new trial based on alleged newly discovered exculpatory evidence.  This evidence consisted of the fact that Limone had been imprisoned since 1968 when he was convicted for the murder of Teddy Deegan along with Salvati, Greco and Tameleo based primarily on the testimony of FBI informant, Barboza.  In <u>Limone</u>, Judge Hinkle granted Limone's motion for new trial based on alleged newly discovered exculpatory

evidence and issued an opinion on the hearing on January 8, 2001.  Judge Hinkle relied on FBI

memos that were attached to a letter dated December 19, 2000, from Department of Justice

Attorney John Durham to Attorney John Cavicchi, counsel for Limone.  The memos showed that

the FBI had knowledge of the planned murder of Deegan two days before the murder; that

Flemmi was involved in the murder; that Flemmi was an FBI informant; that as early at March

12, 1965, and the FBI had information that five persons, other than the persons that Barboza

implicated during the Deegan trial (Limone, Salvati, Greco and Tameleo) were responsible for

the killing.

## IV.    MEDIA PUBLICITY BEGINNING IN 1984

Beginning in the early 1980s, the press in Massachusetts began reporting that innocent

men may have been implicated by government informant Barboza, who indicated his intention to

recant his testimony on the murder of Edward Deegan.[5]

In May 1993, WBZ-TV (Channel 4) reporter Dan Rea began a series of reports

concerning  one of the men that Barboza allegedly falsely accused, Salvati, and aired more than

30 stories on the case.[6]  Additionally, the Boston area media circuit provided extensive news

---

[5]See Murderer Absolves 3 Mobsters In Slaying, THE BOSTON GLOBE, July 20, 1983;
Convicted Murderer Greco Seeks His Freedom, Says He Was Framed, THE BOSTON GLOBE,
August 28, 1984 (Louis M. Greco who passed eight polygraph tests and has an affidavit from a
convict who says Greco was not with him when six bullets killed Edward (Teddy) Deegan says
he was framed by a malicious government informant who implicated him in a 1965 gangland
execution; attorney F. Lee Bailey quotes the informant, Joseph (Barboza) Baron, as saying he lied
when he testified against Greco and five other organized crime figures at their 1968 jury trial); N.
End Wants Its Son Out of Jail, THE BOSTON GLOBE, June 18, 1993 (Former attorney for
Barboza, F. Lee Bailey, says Barboza admitted he framed some of the guys) (Attached to the
Motion to Dismiss at Tab 2.)

[6]See Weld Asks Council To Commute Term of Man In '65 Plot, WORCESTER
TELEGRAM & GAZETTE, Dec. 19, 1996; Governor's Move Is Victory For Newsman, THE

coverage on the FBI's alleged role in procuring Barboza's alleged false testimony to obtain

convictions for Deegan's murder in

order to cultivate a relationship with Barboza.[7]

In December 2000, a series of new articles followed in the aftermath of a disclosure that a

Justice Department Task Force was investigating possible corruption within the FBI [8].  These

---

BOSTON GLOBE, December 19, 1996; Weld Seeks Clemency For Salvati Request To
Commute Convicted Killer's Term Is Reversal For Governor, THE BOSTON GLOBE,
December 19, 1996; Stand By Your Man - Dan Rea's Four-Year Pursuit Of One Story Raises
Ethical Questions – But Would Joe Salvati Be A Free Man If He Hadn't?, BOSTON HERALD,
February 23, 1997 (Attached to the Motion to Dismiss at Tab 3.)

[7]See Convicted Murderer Greco Seeks\His Freedom, Says He Was Framed, THE
BOSTON GLOBE, August 28, 1984; Did FBI Get Help 'Flipping' Mob Killer Barboza?,
BOSTON HERALD, Aug. 5, 1997 (The affidavit states that Barboza admitted he falsely
implicated Mobsters Tameleo and Limone because the federal authorities insisted he implicate
"someone of importance."); Stand By Your Man - Dan Rea's Four-Year Pursuit Of One Story
Raises Ethical Questions – But Would Joe Salvati Be A Free Man If He Hadn't?, BOSTON
HERALD, February 23, 1997; Request For Retrial Opposed DA Says No New Evidence Found
In '65 Slaying, THE BOSTON GLOBE, Oct. 16, 1993; Ex-Agent Retraces Gang War Tells How
FBI Cultivated Mob Pair In Violent '60's, THE BOSTON GLOBE, Jan. 10, 1998 (Attached to the
Motion to Dismiss at Tab 4.)

[8]See FBI Reportedly Hid Key Evidence, THE BOSTON GLOBE, Dec. 21, 2000 ("Secret
documents recently discovered in a Justice Department probe of FBI corruption appear to show
that the Bureau knew not only that the wrong men were convicted of a 1965 gangland murder,
but also that agents were told about the plot two days before it happened and apparently did
nothing to stop it."); Lawyer Urges Judge To Free Man Jailed In 1965 Mob Killing, BOSTON
HERALD, January 2, 2001 ("A Justice Department task force probing corruption within the FBI
released explosive reports last month from agents' files suggesting agents allowed turncoat Mob
hitman Joseph 'The Animal' Barboza to frame four of the six men who went to prison for
Deegan's murder in a Chelsea alley . . . Information contained in the FBI reports show two days
before Deegan was killed on March 12, 1965, an FBI informant told special agent H. Paul Rico
that Vincent Flemmi planned to kill Deegan and that then New England Mafia boss, Raymond
L.S. Patriarca approved the hit. . . . Several days after the killing in a report later forwarded to
FBI director J. Edgar Hoover, Rico wrote the names of five men who the informant said killed
Deegan: Flemmi, Joseph Barboza, Ronald Cassesso, Wilfred Roy French and Romeo Martin.");
Real Killer's Lawyer Says Jailed 'Hit Man' Is Innocent, BOSTON HERALD, Jan. 3, 2001;
Murderer Said Four Were Innocent In '65 Slaying, Lawyer Says, THE HARTFORD COURANT,

---

Jan. 3, 2001; Four Convicted In Mob Killing Could Be Cleared Prosecuter Examining Fresh Evidence; Men May Have Been Framed, THE HARTFORD COURANT, Jan. 4, 2001 ("Late last month, a special federal prosecutor investigating law enforcement corruption discovered a series of secret FBI memos showing that top bureau officers – including former Director J. Edgar Hoover – apparently suppressed credible evidence that could have prevented the four men from being convicted."); Another Day In Court; DA To Seek New Trials For Convicts In Mob Hit, BOSTON HERALD, Jan. 4, 2001 ("Cassesso was approached by the FBI agent handling Barboza, H. Paul Rico, and offered no jail time on the Deegan murder if he backed up Barboza's testimony at trial.  Cassesso declined the deal, Chisolm [Cassesso's attorney] said, saying that he would not implicate innocent men  . . . Those informant reports not only identified the real killers just days after Deegan was murdered, but also revealed that Rico and other top FBI officials knew of the Deegan murder plot at least two days before it happened."); Convict In '65 Slaying May Gain Freedom, THE BOSTON GLOBE, January 5, 2001; New Trial Ordered For Man Who Served 32 Years For Murder, THE PROVIDENCE JOURNAL, Jan. 6, 2001 ("The reports, which [Judge] Hinkle said were key in her decision to free Limone, show that informants told FBI agents of plans for the slaying before Deegan was killed and even gave the agents a list of those involved."); Judge Frees Man In '60s Mob Case, THE HARTFORD COURANT, Jan. 6, 2001; Court Frees Limone After 33 Years In Prison, THE BOSTON GLOBE, Jan. 6, 2001 ("Defense lawyers allege that Barboza and the FBI framed Limone, Tameleo, Greco, and  [] Salvati in order to settle personal scores and to satisfy a mandate from FBI headquarters to make cases against the underworld"); Judge Vacates Murder Conviction, AP ONLINE, Jan. 18, 2001; Salvati Ruling Bitter, Sweet In Celebrating, He Can't Forget 30 Years He Lost, THE BOSTON GLOBE, Jan. 19, 2001; FBI Let 'Fall Guy' Serve 33-Year Term, THE SEATTLE TIMES, Jan. 30, 2001; Freedom For The Fall Guys After Decades Behind Bars Justice:  Four Boston Hoods Were Framed For 1965 Mob Murder, A New FBI Corruption Probe Suggests, LOS ANGELES TIMES, Jan. 30, 2001; Charges Dropped In 1965 Mob Case, AP ONLINE, Jan. 30, 2001; 2 Freed In '65 Murder Case FBI Allowed Framup To Protect Mob Informant, PITTSBURGH POST-GAZETTE,  Jan. 31, 2001; Charges Dropped In 1965 Boston Mob Hit, THE PROVIDENCE JOURNAL, Jan. 31, 2001; Prison Time May Pay Off - Deegan Trial Trouble Lead To Suit, BOSTON HERALD, Feb. 8, 2001 ("Attorneys for four men, who spent more than 100 combined years in prison for murder after the FBI hid evidence of their innocence, vow to file a civil suit and expose a 'system-wide coverup' in Boston that spanned three decades."); FBI Claims Police Got Evidence In '65 Mob Hit, BOSTON HERALD, Feb. 15, 2001; The Conviction Of Marie Salvati For 30 Years, The Salvatis Were Kept Apart.  Faith And Love Saw The Family Through A Prison Ordeal, THE BOSTON GLOBE, Apr. 4, 2001; Answered Prayers Olly Limone Knew Her Husband Had Been Wrongly Convicted, But She Had To Wait 33 Years For Proof, THE BOSTON GLOBE, Apr. 22, 2001; Mob Victims' Kin Wants To Talk - Bennett: Feds Have To Police The Police, BOSTON HERALD, Apr. 23, 2001; Wronged By The FBI, Free At Last Man's Wife, Children, Innocence Helped Him Bear 30 Years In Prison, THE HARTFORD COURANT, Apr. 29, 2001; Justice To Release Hub Mob Documents, BOSTON HERALD, June 7, 2001; Gross Injustice, THE BOSTON GLOBE, June 10, 2001 ("Recently uncovered FBI documents 'suggest that FBI agents not only knew that Limone and his co-

6

articles revealed  that a Department of Justice Attorney, John Durham, in a December 19, 2000,

letter released reports suggesting that agents may have allowed informant Barboza to frame men

for Deegan's murder while protecting his friend, Vincent Flemmi.  (See Durham Letter, Dec. 19,

2000) (Attached to the Motion to Dismiss at Tab 6).  These reports also stated that agent Rico

had information two days before the Deegan murder that Flemmi planned to kill Deegan; Flemmi

obtained permission to do so from New England Mafia boss, Raymond L.S. Patriarca; and

several days after the murder, Rico sent a report to FBI Director Hoover that listed five men

involved in the murder but did not name Salvati, Tameleo, Greco and Limone.

## ARGUMENT

Sovereign immunity is a fundamental principle in our legal system that bars lawsuits

against the United States unless it consents to be sued.  See United States v. Mitchell, 445 U.S.

535, 538 (1980); Dynamic Image Technologies, Inc. v. United States, 221 F.3d 34, 39 (1st Cir.

2000); Federal Deposit Insurance Company v. Meyer, 510 U.S. 471, 475.  In situations where the

---

defendants were innocent but also knew of the [Edward] Deegan murder plot two days before it
happened and did nothing to stop the killing' shatters whatever faith I had left in our justice
system.  The FBI acted out of the belief that the ends justified the means, the 'end' being its need
to protect its own informants, in particular, hit man Joseph "The Animal" Barboza.  Now that is
criminal."); FBI's Role At Issue In Vain Search For Freedom, THE BOSTON GLOBE, July 16,
2001; Wrongly Imprisoned Man Joins Claim, AP ONLINE, July 25, 2001 ("A man freed earlier
this year after spending 33 years in prison for a murder he didn't commit has joined in a $375
million claim against federal officials . . . The reports showed that informants told FBI agents of
plans for the Deegan slaying, and later gave the agents a list of those involved."); Feds Face False
Conviction Claim, HOUSTON CHRONICLE, July 26, 2001; Feds Allegedly Helped Hit Man
Beat Slay Rap, BOSTON HERALD, July 28, 2001;  Parole Board Asked To Clear Dead Man Of
Murder He Didn't Commit, BOSTON HERALD, Nov. 12, 2001 ("Greco himself passed a lie
detector test in 1982 on a national television show where he denied taking part in the plot to kill
Deegan, an amateur boxer who attorneys and congressional investigators who have studied the
Deegan case believe the FBI manipulated Barboza to falsely accuse Greco, Henry Tameleo, Peter
Limone and Joseph Salvati of killing Deegan.") (Attached to the Motion to Dismiss at Tab 5.)

United States has waived sovereign immunity, only it can define the terms under which it will

allow suit, thereby establishing the court's jurisdiction to entertain the suit.  Id.; Hydrogen

Technology Corp. v. United States, 831 F.2d 1155, 1160 (1st Cir. 1987).  The Federal Tort

Claims Act, 28 U.S.C. § 1346(b), 2671 et seq., waives sovereign immunity subject to express

conditions and exclusions.

One of those conditions is that "[a] tort claim against the United States shall be forever

barred unless it is presented in writing to the appropriate Federal agency within two years after

such claim accrues." 28 U.S.C. § 2401(b); McIntyre v. United States, 367 F. 3d 38, 51 (1st Cir.

2004).  This limitation, which requires that plaintiffs diligently pursue potential claims against

the United States, is strictly construed in favor of the sovereign.  U.S. v. Kubrick, 444 U.S. 111,

123 (1979); Attallah, 955 F.2d at 779.  The presentation of a timely administrative claim is a

prerequisite for subject matter jurisdiction.  See  Gonzalez v. United States, 284 F.3d 281, 288

(1st Cir. 2002) (if more than two years has lapsed between the filing of an administrative claim

and accrual, no jurisdiction exists); Gonzalez-Bernal v. United States, 907 F.2d 246, 248 (1st Cir.

1990); Richman v. United States, 709 F.2d 122, 124 (1st Cir. 1983).  Accrual is determined

pursuant to federal law.  See Kubrick, 444 U.S. at 117-125; Heinrich v. Sweet, 44 F. Supp. 2d

408, 415 (D. Mass. 1999).

Plaintiffs presented their administrative claims on December 5, 2003.  Thus, for their

administrative claims to be timely, the claims must have accrued on or after December 5, 2001.

In fact, the vast media reports of Barboza's intention to recant his testimony beginning in 1983

should have triggered the plaintiffs' interest enough to start an investigation as to whether the

correct individuals were in prison for their father's murder.  Further, as early as September 15,

8

1999, Judge Wolf entered the opinion in United States v. Salemme detailing the questionable

relationship between the FBI and certain informants.  These hearings on the FBI's alleged

mishandling of its informants occurred two years before the Salemme opinion was published,

and specifically addressed the Deegan case.  Certainly, plaintiffs should have known by

December 2000, when newspaper articles were published stating that FBI agents were told about

the plot to kill Deegan bud did nothing about it.  The latest possible accrual date was January 8,

2001, when Judge Hinkle entered the opinion after a hearing in Commonwealth v. Limone

concerning defendant Limone's motion for a new trial based on the evidence released by a federal

prosecutor that forms the basis of this lawsuit. Notwithstanding this, plaintiffs filed their claims

more than two years beyond publication of information revealing that the FBI had advance

knowledge of the Deegan murder and more than two years after the Commonwealth v. Limone

opinion.

**I.      The Plaintiffs' Claims Are Jurisdictionally Barred Because They Were Filed More
         Than Two Years After Accrual.**

Skwira v. United States, 344 F.3d 64 (1st Cir. 2003) and McIntyre v. United States, 367

F.3d 38 (1st Cir. 2004), are relevant precedent from the First Circuit involving the FTCA's statute

of limitations.  In both cases, the First Circuit decided whether plaintiffs had notice for purposes

of accrual based on an objective standard.  In Skwira, the court articulated the following

standard: "the proper subject of knowledge for accrual purposes under the FTCA is (1) the fact of

the injury and (2) the injury's causal connection with the government."  Skwira, 344 F.3d at 77.

The Skwira court stressed that "there is, of course, a reasonable diligence component to this

knowledge requirement.  A plaintiff may not 'bury her head in the sand.'  If she fails to undertake

a reasonably diligent investigation into the cause of injury, the law will impute to her an awareness of any knowledge that she would have uncovered if she had undertaken that inquiry." Id. (citations omitted); see also McIntyre v. United States, 367 F.3d 38, 52 (1st Cir. 2004) (although "[a] claim does not accrue when a person has a mere hunch, hint, suspicion, or rumor of a claim . . . such suspicions give rise to a duty to inquire into the possible existence of a claim in the exercise of due diligence.").  Therefore, definitive knowledge is not required for a claim to accrue. McIntyre, 367 F.3d at 52 (emphasis added).

In Skwira, the decedent's family argued that "[t]he critical facts regarding the existence and cause of [Skwira's] injury were inherently unknowable" until they were told by investigators that the decedent died as a result of an illegally administered drug.  Id. at 81.  The court disagreed, explaining "[t]he factual basis of a claim is 'inherently unknowable' when . . . there are no facts discoverable through the exercise of reasonable diligence which would permit a plaintiff to reasonably believe that her injury is connected with some act of the government."  Id. (citing Attallah v. United States, 955 F.2d 776 (1st Cir. 1992)).  Importantly, the Skwira court noted that "to file an administrative claim and preserve one[']s rights under the FTCA, one need only be in possession of 'sufficient information for the agency to investigate the claims.'"  Id. (quoting Santiago-Ramirez v. Secretary of Dept. of Defense, 984 F.2d 15, 19 (1st Cir. 1993)).  The court stressed that "one does not have to be certain of actionability in order to submit an administrative claim."  Id. (emphasis in original).

McIntyre, involved two distinct cases where individuals were allegedly murdered by two FBI informants, Bulger and Flemmi.  McIntyre, 367 F.3d. 38.  Applying the Skwira standard, the First Circuit reversed McIntyre on the ground that, under one of the plaintiff's theories, accrual

did not begin until the family had a factual basis for its claim that the FBI betrayed McIntyre by revealing his cooperation to the FBI informants. Id. Dismissal of the Wheeler claims was affirmed, however, because the Wheelers' theory of liability was "not based on any direct relationship between Roger Wheeler and the FBI." Id. at 57. Rather, the Wheeler family asserted that certain FBI agents, had "provided Bulger and Flemmi with a 'protective shield' against prosecution and investigation that gave the two criminals the opportunity to commit crimes and emboldened them to do so, proximately causing Wheeler's murder." Id. at 58.

The First Circuit held that for the Wheelers' claims to accrue, there had to be facts available that would permit a reasonable person to conclude "(1) that Bulger or Flemmi were instrumental in the murder of Roger Wheeler; (2) that Bulger and Flemmi were informants for the FBI; and (3) that the FBI had a special relationship with Bulger and Flemmi that protected and encouraged them in their criminal activity, including Wheeler's murder." Id. The Court held that the "Wheelers clearly had sufficient notice of the first two sets of facts before the accrual date." Id. The First Circuit held that the Wheelers were on notice of the FBI's special protective relationship with Bulger and Flemmi because, inter alia, "there was national and local news coverage before the critical date describing the FBI's shielding of Bulger and Flemmi from prosecution." Id.

Like the Wheeler case, Deegan had no special relationship with the FBI; neither Wheeler nor Deegan were FBI informants. In the instant case, the plaintiffs theory is that FBI agents knew of the planned murder of Deegan; failed to warn Deegan; failed to control their informant, Barboza; and failed to take steps to prevent the murder. (Complaint at ¶ 17.). Under the McIntyre test, the plaintiffs claims accrued when facts were available that would permit a

reasonable person to conclude that: 1) the FBI had knowledge of the planned murder; and 2) Barboza was an informant of the FBI.

Plaintiffs only needed notice of two facts to fulfill the McIntyre test for all of the elements in their theory of the case because knowledge of the planned murder provided notice for four of the elements of plaintiffs' theory of the case. When plaintiffs had notice of knowledge of the planned murder, they also had notice that the FBI allegedly failed to warn Deegan because he was killed despite FBI's alleged knowledge of the plan. When plaintiffs had notice of FBI's knowledge of the planned murder, they also had notice that the FBI allegedly failed to control Barboza because based on the knowledge of the plan, it is reasonable to assume that some control of Barboza may have prevented Barboza's involvement in the murder. When plaintiffs had notice of FBI's knowledge of the planned murder, they also had notice of FBI's alleged failure to take steps to prevent the murder because the published information that showed that the FBI had notice of the planned murder provided plaintiffs sufficient information to established a duty to inquire as to whether the FBI took steps to prevent the murder according to Skwira.

The plaintiffs had this information as late as January 8, 2001, when Judge Hinkle issued the Limone opinion. In Limone, Judge Hinkle granted Limone's motion for new trial based on alleged newly discovered exculpatory evidence and issued an opinion on the hearing on January 8, 2001. Judge Hinkle relied on FBI memos that were attached to a letter dated December 19, 2000, from Department of Justice Attorney John Durham to Attorney John Cavicchi, counsel for Limone. The memos showed that the FBI had knowledge of the planned murder of Deegan two days before the murder; that Flemmi was involved in the murder; that Flemmi was an FBI informant; that as early at March 12, 1965, and the FBI had information that five persons, other

than the persons that Barboza implicated during the Deegan trial (Limone, Salvati, Greco and

Tameleo) were responsible for the killing.[9]

Clearly, under the objective standard, any reasonable person whose father's 1965 murder

and murder trial received such extensive media coverage and national attention would have an

interest in new developments in the case.  This case became a high profile one after it was

revealed that Barboza's testimony may have been false and FBI may have known it before

Barboza testified, and most important, that the FBI had advanced notice of the planned murder.

All of this resulted in heavy media coverage in the Boston area and the nation at large.

**II.    The Fraudulent Concealment Doctrine Will Not Save Plaintiff's Suit.**

Any attempt by the plaintiff to invoke the doctrine of fraudulent concealment fails.

Assuming <u>arguendo</u> that it is applicable,[10] plaintiff cannot meet the conditions of the doctrine.

Specifically, the doctrine of fraudulent concealment may toll the statute of limitations only if two

---

[9]Should this Court accept the plaintiffs assertion that their claim was filed on January 27, 2003 by an unauthorized agent, the plaintiffs still missed the statute of limitations because their claim would have had to accrue on January 27, 2001, which is after the <u>Limone</u> opinion on which plaintiffs rely.

[10]In <u>United States v. Beggerly</u>, 524 U.S. 38, 48 (1998), the Supreme Court determined that equitable tolling was not permitted where it is inconsistent with the text of the relevant statute.  Specifically, the Supreme Court ruled that equitable tolling does not apply to the statute of limitations provision contained in the Quiet Title Act, 28 U.S.C. § 2409a(g), because the language of the statute provides that a claim does not accrue until the plaintiff knew or should have known of the claim against the United States. <u>Beggerly</u>, 524 U.S. at 48.  The Court ruled that it would not be warranted in extending the terms of the limitations period. <u>Id</u>. <u>Beggerly</u> has been interpreted to "strongly indicate[] that the doctrine of equitable tolling is not applicable to FTCA actions" because "virtually all courts have held that accrual of an FTCA action is delayed until a plaintiff knows or should know of his injury and its cause . . . ."  2 LESTER S. JAYSON, HANDLING FEDERAL TORT CLAIMS, § 14.01[2] (2001); <u>Accord Wukawitz v. United States</u>, 170 F. Supp. 2d 1165, 1170 (D. Utah 2001) (holding that equitable tolling does not apply to the FTCA).

conditions are met: (1) "the defendant raising the limitations defense must have engaged in fraud

or deliberate concealment of material facts related to the wrongdoing;" and (2) "the plaintiff must

have failed to discover these facts within the normal limitations period despite his or her exercise

of due diligence." Gonzalez, 284 F.3d at 292.

If the plaintiffs were to provide additional facts to support an assertion that they

confronted the FBI and that it engaged in fraud, their claims would still fail because even if they

relied on false statements, with reasonable diligence, they would have discovered the falsity

before December 5, 2001.  See Premium Management, Inc. v. Walker, 648 F.2d 778, 783 (1st

Cir. 1981) (even assuming the plaintiff relied on a false statement, had he acted with reasonable

diligence he "should have discovered the falsity . . ."); McIntyre v. United States, 254 F. Supp.

2d. at 189, 191 (dismissing case despite finding "circumstances that support the plaintiffs' claim

of concealment" because plaintiffs did not rely on the government's denials).

Furthermore, when Attorney John Durham released the FBI memos on December 19,

2000, on the Deegan murder, any prior concealed information was revealed.  Even if the FBI

made prior contradictory statements to the plaintiffs, they should have and could have discovered

that the FBI had knowledge of the planned murder and that Barboza was an informant as early as

the 1980s as a result of the barrage of media attention on this matter; during or after the Salemme

hearings from 1997 through 1999 and; during the Limone hearing on January 5, 2001.

Fraudulent concealment cannot be relied upon when the facts supporting plaintiff's suit

were nonetheless known more than two years before submission of the claim.  Gonzalez-Bernal,

907 F.2d at 1250.  McIntyre, 254 F. Supp. 2d. at 191.  Fraudulent concealment is available only

when a plaintiff "has been injured by fraud and remains in ignorance of it without any fault or

want of diligence or care on his part."  <u>Gonzalez v. United States</u>, 284 F.3d 281, 292 (1st Cir.

2002).   In this case, even if the plaintiffs allege that they previously contacted the FBI and the

FBI denied that it had additional knowledge about the murder and that Barboza was an informant

prior to 2000, by December of that year, the plaintiffs should have known of their injury and its

cause more than two years before filing their administrative claims.

Equitable tolling is only invoked if a plaintiff "in the exercise of reasonable diligence,

could not have discovered information essential to the suit."  <u>Gonzalez v. United States</u>, 284 F.3d

281, 291 (1st Cir. 2002).  Therefore, even assuming the applicability of equitable tolling to this

case, plaintiff cannot satisfy the test.  According to this record, the plaintiffs did nothing to

investigate despite all of the publicized information on the Deegan murder, so they in no way

exercised reasonable diligence to discover any information essential to their claims as required by

law.

**CONCLUSION**

Based on the foregoing, the United States respectfully requests that its motion to dismiss be granted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

 /s/Bridget Bailey Lipscomb
BRIDGET BAILEY LIPSCOMB
Trial Attorney, Torts Branch
Civil Division, U.S. Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C.  20044
(Phone) (202) 616-9356
(Fax) (202) 616-5200

Dated:  November 22, 2004            Attorneys for the United States