## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                          )
Catherine Deegan Patterson, *et al.*                      )
                                                          )
                          Plaintiffs,                     )
                                                          )
         v.                                               )    CIVIL ACTION NO. 04-11817 JLT
                                                          )
United States of America, *et al.*                        )
                                                          )
                          Defendants.                     )
_____)

## UNITED STATES' REPLY TO PLAINTIFFS'
## OPPOSITION TO MOTION TO DISMISS

### INTRODUCTION

The United States moved to dismiss this action for lack of subject matter jurisdiction because plaintiffs failed to present their administrative claim within two years of accrual as required by statute, 28 U.S.C. § 2401(b), and now the claims are forever barred.  Id.  It established that plaintiffs reasonably should have known of their injury and its cause substantially more than two years before their claims were filed based on the revelations in judicial proceedings concerning their father's death and the attendant widespread media publicity.

In response to the United States' Motion to Dismiss, the plaintiffs filed two briefs, an "Opposition" accompanied by affidavits of the decedent's daughters and a "Submission" with affidavit of the decedent's brother.  Both briefs argue that the plaintiffs' claims did not accrue until they had actual knowledge that the FBI knew of the planned murder of the decedent, Edward "Teddy" Deegan.  However, the First Circuit uses an objective standard for

1

determining accrual that is based on knowledge of the fact of an injury and its causal

connection to the government.  Judge Hinkle's decision on January 8, 2001, discussed FBI's

alleged knowledge of the plan to murder Deegan and it is undisputed that the decision

received immediate and widespread coverage.  In addition to the extensive media coverage in

the Boston area, this matter was covered by the national media circuit.[1]  The new information

was also widely covered by national television stations.  For example, on January 8, 2001,

Bryant Gumbel interviewed Peter Limone on "The Early Show," about his release from

prison based on the Department of Justice documents.  <u>A Man Set Free After 32 Years</u>

<u>Behind Bars</u>, Bryant Gumbel, "The Early Show," January 8, 2001. (Attached hereto as Exh.

_____

[1]<u>See</u> <u>Across The USA:  News From Every State</u>, USA TODAY, Feb. 6, 1997 ("The
Governor's Council voted to commute the life sentence of Joseph Salvati, 64, who has served 30
years in prison for conspiracy in the '65 murder of Edward Deegan.  Salvati has always
maintained his innocence.");  <u>Man Freed After 32 Years</u>, CBSNEWS.COM, Jan. 8, 2000 (Last
month, Justice Department investigators looking into allegations of corruption in the office gave
Limone's lawyer secret FBI reports from the time around Edward "Teddy" Deegan's 1965
murder.  The documents showed that an informant had given the FBI a list of suspects that did
not include Limone's name.");  <u>Man Freed After Serving 32 Years</u>, AP ONLINE, Jan. 5, 2001
("Last month, Justice Department investigators looking into allegations of corruption in the
office gave Limone's lawyer secret FBI reports from the time around Edward "Teddy" Deegan's
1965 murder.  The documents showed that an informant had given the FBI a list of suspects that
did not include Limone's name.");  <u>Judge Cites FBI Lapses, Frees Prisoner</u>, CHICAGO
TRIBUNE, Jan. 6, 2001 ("Last month, Justice Department investigators scrutinizing allegations
of corruption in the office gave Limone's lawyer secret FBI reports from the time around Edward
Deegan's 1965 murder.");  <u>Murder Conviction Tossed in 60's Case</u>, NEW YORK TIMES, Jan. 7,
2001 ("Prosecutors said newly discovered Federal Bureau of Investigation files from the 1960's
had cast doubt on the guilt of the man, Peter Limone, 66, in the killing of Edward Deegan in
1965 . . . Last month, Justice Department investigators looking into allegations of corruption in
the F.B.I.'s Boston office gave Mr. Limone's lawyer reports that showed an informer had given
the bureau a list of suspects that did not include Mr. Limone.");  <u>Freed Man Meets Grandkids</u>,
NEWSDAY, Jan. 8, 2001 (A Massachusetts state judge released Peter Limone, 66, after
prosecutors asked that his conviction for the 1965 murder of mobster Edward Deegan be thrown
out.  Prosecutors said FBI files released last month cast doubt on Limone's guilt.");  <u>Man's
Conviction Reversed After 32 Years</u>, THE WASHINGTON TIMES, Jan. 8, 2001.  (Attached
hereto as Exh.1.)

2).[2]

Although they provide many excuses for missing the deadline, plaintiffs do not provide a legal basis to toll the statute of limitations. The "Submission" asserts and the "Opposition" agrees that the Court should overlook Richard Deegan's "19-day" untimeliness because the FTCA's notice requirement is "minimal." This argument ignores the fact that the statute of limitations is a jurisdictional requirement that cannot be waived. The Deegan daughters, who filed their claims more than 10 months too late, cannot proceed based on the administrative claim filed by Richard Deegan, which is both defective and untimely.[3]

## ARGUMENT

### I.    In The First Circuit, Notice For Accrual Purposes Is Based On An Objective Standard.

The plaintiffs first contend that the statute of limitations should be tolled because they did not become aware of Judge Hinkle's ruling on or about the date of its issuance when it received immediate and widespread coverage. They allege that it was not until they were approached by friends and advised that FBI may have known of Deegan's planned murder that they had sufficient information to start the limitation period. This occurred approximately one month after the decision was issued in the case of one of the daughters

---

[2] On May 10, 1998, Joe Salvati was interviewed by Ed Bradley on CBS's "60 Minutes" program about his prison term for the murder of Deegan, despite Barboza's admission that he lied on the stand and received pressure from the FBI not to implicate Vincent Flemmi, the brother of Top Echelon FBI Informant, Stephen Flemmi. Ed Bradley, "60 Minutes," May 10, 1998. (Attached hereto as Exh. 3).

[3] The plaintiffs seem to suggest that even though their wrongful death claims may be untimely, the emotional distress claim of Plaintiff Yvonne Deegan Gioka is timely. This argument is flawed because as discussed *infra*, the FTCA requires all claims to be brought within two years of accrual. A claim for emotional distress is no exception.

3

who failed to mention it to the other for more than a year.  However, in *Skwira v. United States*, 344 F.3d 64 (1st Cir. 2003) and *McIntyre v. United States*, 367 F.3d 38 (1st Cir. 2004), the First Circuit held that the determination of whether a plaintiff had notice for purposes of accrual is based on an objective standard.  The *Skwira* court stressed that "there is, of course, a reasonable diligence component to this knowledge requirement.  A plaintiff may not '*bury her head in the sand.*'  If she fails to undertake a reasonably diligent investigation into the cause of injury, the law will impute to her an awareness of any knowledge that she would have uncovered if she had undertaken that inquiry."  Id. (citations omitted)(emphasis added); *see also McIntyre v. United States*, 367 F.3d 38, 52 (1st Cir. 2004) (although "[a] claim does not accrue when a person has a mere hunch, hint, suspicion, or rumor of a claim . . . such suspicions give rise to a *duty to inquire* into the possible existence of a claim in the exercise of due diligence.").  Definitive knowledge, therefore, is not required for a claim to accrue.  *McIntyre*, 367 F.3d at 52 (emphasis added).[4]

---

[4]*McIntyre*, involved two distinct cases where individuals were allegedly murdered by two FBI informants, Bulger and Flemmi.  *McIntyre,* 367 F.3d. 38.  Applying the *Skwira* standard, the First Circuit affirmed the dismissal of the Wheeler case because the Wheelers' theory of liability was that certain FBI agents, had "provided Bulger and Flemmi with a 'protective shield' against prosecution and investigation that gave the two criminals the opportunity to commit crimes and emboldened them to do so, proximately causing Wheeler's murder." Id. at 58. This theory, unlike the *McIntyre*, theory was "not based on any direct relationship between Roger Wheeler and the FBI." *Id.* at 57.

The First Circuit held that the Wheelers were on notice of the FBI's special protective relationship with Bulger and Flemmi because, *inter alia*, "there was national and local news coverage before the critical date describing the FBI's shielding of Bulger and Flemmi from prosecution." *Id.*

Like the *Wheeler* case, Deegan had no special relationship with the FBI; neither Wheeler nor Deegan were FBI informants.

The existence of a potential claim should have been apparent to a reasonably diligent plaintiff on January 8, 2001, when Judge Hinkle issued the *Limone* opinion granting a new trial for Mr. Limone, who was convicted for the murder of plaintiffs' decedent, based on alleged newly discovered exculpatory evidence.  Judge Hinkle relied on FBI memos that were attached to a letter dated December 19, 2000, from Department of Justice Attorney John Durham to Attorney John Cavicchi, counsel for Limone.  The memos showed that the FBI had knowledge of the planned murder of Deegan two days before the murder; that Flemmi was involved in the murder; that Flemmi was an FBI informant; and that as early at March 12, 1965, the FBI had information that five persons, other than the persons that Barboza implicated during the Deegan trial (Limone, Salvati, Greco and Tameleo) were responsible for the killing.

As shown by Exhibit 1, this revelation generated massive publicity about the circumstances surrounding the death of the decedent.  Plaintiffs did not have to conduct a pain-staking search to uncover it.  They only had to read the newspapers where it was revealed that Barboza's testimony may have been false and the FBI may have known it before Barboza testified.[5]  Clearly, under the objective standard, the plaintiffs should have known of

---

[5]The plaintiffs seem to suggest since neither one of the plaintiffs lived in Boston, the media publicity does not apply to them.  Notwithstanding, Ms. Patterson lived in the Boston area, less than 50 miles from Boston, and Richard Deegan lived in the Boston area so they had ready access to the information covered in the Boston Globe.  Moreover, while Ms. Patterson may not have had actual knowledge until February 2001, and Ms. Gioka may not have had actual knowledge until the summer of 2002, the national media publicity was sufficient to put plaintiffs on notice.

According to *McIntyre*, "there is a difference between 'knew' and 'should have known.' . . . As to whether a plaintiff 'reasonably should have known' critical facts, the inquiry is an objective one.  *McIntyre*, 367 F.3d at 59.  *McIntyre* also addresses the plaintiffs' geographic area argument.  "Where there are several plaintiffs and they do not live in the same geographic area,

the FBI's knowledge of the planned murder of Deegan.

The plaintiffs attached three affidavits to their opposition to show that they did not have personal or subjective knowledge that the FBI knew of the planned murder of Deegan. Plaintiff Catherine Deegan Patterson ("Ms. Patterson") states that for the last twenty years, she lived in the Boston area, approximately 46 miles outside of Boston in Danville, New Hampshire. Ms. Patterson states that she learned that the FBI knew of plans by mobsters to kill Deegan from a friend in February 2001.[6] Plaintiff Yvonne Deegan Gioka ("Ms. Gioka") states that she remembers seeing a CNN report on Mr. Salvati, but that she did not know that the FBI knew of Deegan's planned murder until she was told by her sister, Ms. Patterson, in the summer of 2002. Ms. Gioka also states that as a result of an automobile accident, she suffered brain trauma and she had a stroke in 2002.[7] Additionally, the plaintiffs submit the

_____

and public notice of the underlying facts is restricted to certain areas, geography is a factor to be considered." *Id* at 60. In the instant case, the coverage was national, and therefore, public notice of the facts is not restricted to a certain geographic area. Whether the plaintiffs lived in New Hampshire, Georgia, New York or Massachusetts, the national media coverage put them on notice of the underlying facts that triggered a duty to inquire. "[W]here events receive . . . widespread publicity, plaintiffs may be charged with knowledge of their occurrence." *Id. citing United Klans of Am. v. McGovern*, 621 F.2d 152, 154 (5th Cir. 1980)(national news coverage over networks, wire, and newspapers reported facts supporting the claim).

[6]Ms. Patterson's knowledge can be imputed to Ms. Gioka because where, "some members of the family have actual notice but others do not, the issue of how strong the family's ties are and how frequently they communicate can be relevant." *McIntyre*, 367 F. 3d at 60. Ms. Patterson states in her affidavit that she did not tell her sister, Yvonne Deegan Gioka, about FBI's knowledge of the planned murder when she learned it because she did not believe that Ms. Gioka's health was strong enough to hear the information. Clearly, the sisters had a communicative relationship in February 2001, but Ms. Patterson made an informed decision to keep the information from her sister. Therefore, Ms. Patterson's February 2001 knowledge must be imputed to her sister.

[7]Ms. Gioka's illness does not toll the statute of limitations. "It is clearly the law that disability due to insanity or mental incompetency will not toll the running of the two year statute

6

affidavit of their uncle, Richard Deegan.  Richard Deegan states that he learned that the FBI

had knowledge of Deegan's planned murder from a friend on or about January 31, 2001.  All

three affiants deny reading the specific articles on Edward "Teddy" Deegan's death cited by

the United States or seeing the television news stories.

     Nonetheless, these affidavits submitted by the plaintiffs are not determinative because

the First Circuit has ruled that the objective knowledge, not the subjective knowledge of the

plaintiffs and their family members, is controlling for statute of limitations purposes.  Even if

the plaintiffs were personally unaware, it is readily apparent that information on any alleged

FBI involvement in Deegan's death was not "inherently unknowable."  *See Skwira*, 344 F.3d

at 81 *(citing Allallah v. United States*, 955 F.2d 776(1st Cir. 1993)).  Rather, these facts were

discoverable through the exercise of reasonable diligence as early as 1984, when the media

began reporting that innocent men may have been implicated by government informant

Barboza for the murder of Edward Deegan, but certainly no later than January 8, 2001, when

Judge Hinkle issued an opinion granting Limone's motion for new trial based on alleged

newly discovered evidence consisting of memos that showed that the FBI had knowledge of

---

of limitations of § 2401(b)."  *Zeidler v. United States*, 601 F.2d 527, 529 (10th Cir. 1979); *Casias v. United States*, 532 F.2d 1339, 1342 (10th Cir. 1976)(insanity, such as constituted legal disability in most states, does not toll statute of limitations under Federal Tort Claims Act); *citing Accardi v. United States*, 435 F.2d 1239 (3d Cir. 1970); *Williams v. United States*, 228 F.2d 129 (4th Cir. 1955), *cert. denied* 351 U.S. 986 (76 S.Ct. 1054, 100 L.Ed. 1499) *Reh. den.* 352 U.S. 860 (77 S.Ct. 26, 1 L.Ed.2d 71)(1956).  *See also, Jackson v. United States*, 234 F.Supp. 586 (E.D. South Carolina, 1964)(insanity or mental incompetency does not suspend or toll federal statute of limitations under Federal Tort Claims Act).

    "Congress was entitled to assume that the limitation period it prescribed meant just that period and no more suggesting that even the outbreak of wartime hostilities would not toll section 2401(b). . . '[U]nbending interpretation [] has been given to section 2401(b) in accordance with the manifested legislative goal of the expeditious bringing and resolution of tort claims against the government.'"  *Vega-Velez v. United States*, 627 F.Supp. 773 (D. P. R. 1986).

the planned murder of Deegan.  Although, as plaintiffs and their uncle concede, they had

actual knowledge within two years of Judge Hinkle's ruling of the factual basis for their

claim, they nonetheless chose to sit on their rights.  In doing so, they took a calculated (albeit

inexplicable) risk by filing many months too late; as a result their claim is forever barred.

Further, plaintiffs cannot escape the untimeliness of their claim by asserting that the

notice requirement is "minimal."  While it is true that a claimant need only provide enough

information to allow the agency to investigate the claim, *Santiago-Ramirez v. Sec. of Dept. of

Defense*, 984 F.2d 16 (1st. Cir. 1993), that notice must be provided within two years.  Failure

to comply with this requirement cannot be "overlooked" as plaintiffs suggest because it is a

jurisdictional prerequisite to suit.  28 U.S.C. § 2401(b); *McNeil v. United States*, 508 U.S.

106 (1993); *Gonzalez-Bernal v. United States*, 907 F.2d 246, 248 (1st Cir. 1990).

## II.    Plaintiffs' December 5, 2003, Administrative Claim Cannot Relate Back To The January 27, 2003, Administrative Claim Filed By Their Uncle Because The Earlier Claim Was Untimely And Defective.

Plaintiffs assert that their claim is timely because it relates back to the January 27,

2003, claim that was filed their uncle, Richard Deegan.  This argument fails for two reasons.

First, pursuant to the objective standard, Richard Deegan's January 27, 2003, claim is

untimely both because it was filed more than two years after it accrued , as shown above, and

because no suit was filed within six months of denial of the claim as required by 28 U.S.C. §

2401(b).  Second, Richard Deegan's claim is defective because Massachusetts law does not

allow a voluntary administrator to bring a wrongful death claim.

### A.    The January 27, 2003, Claim Is Untimely Because It Was Filed Too Late.

It is clear that the plaintiffs realize and acknowledge that they missed the statute of

limitations when they filed their claim on December 5, 2003. Therefore, they now attempt to adopt the administrative claim filed by Richard Deegan. However, Richard Deegan's administrative claim, like Ms. Patterson's, is not timely because it was filed more than two years after issuance of Judge Hinkle's opinion. While plaintiffs argue that, "a twenty-three day delay in Richard Deegan's learning of the new facts revealed in Judge Hinkle's January 8 decision is reasonable," Opposition, p. 8, that statement is not the law.[8] Whether the plaintiffs missed the statute of limitations by one day, nineteen days or twenty-three days is irrelevant, the law requires the claims to be brought within two years of accrual.[9] *See Gonzalez v. United States*, 284 F.3d 281, 288 (1st Cir. 2002) (if more than two years has lapsed between the filing of an administrative claim and accrual, *no jurisdiction exists*); *Gonzalez-Bernal v. United States*, 907 F.2d at 248 (emphasis added); *Richman v. United States*, 709 F.2d 122, 124 (1st Cir. 1983).

---

[8]The plaintiffs argue that there was a twenty-three day delay in obtaining subjective knowledge of Judge Hinkle's decision in their "Opposition," and then argue that there was a nineteen day delay in their "Submission."

[9]The FTCA also states: "A tort claim against the United States shall be forever barred unless . . . action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented." 28 U.S.C. § 2401(b). The United States denied Richard Deegan's administrative claim prior to March 29, 2004. *See* Denial Letter and Return Receipt, Exh. 4. To date, Richard Deegan has not filed a lawsuit against the United States. Since more than six months have passed since the denial of his claim, his claim is forever barred. *See Cascone v. United States,* 370 F.3d 95, 103 (1st Cir. 2004); *Roman v. Townsend*, 224 F.3d 24, 28 (1st Cir. 2000); *Attallah v. United States,* 955 F.2d 776, 780 ( 1st Cir. 1992)("If a plaintiff does not bring a court action within six months following the denial of a claim before a federal agency, then they are forever barred from bringing a court action based on the same facts."); *Gonzalez-Bernal v. United States*, 907 F.2d at 248; *Kollios v. United States,* 512 F.2d 1316 (1st Cir. 1975); *Berti v. V.A. Hospital*, 860 F.2d 338 (9th Cir. 1988); 28 U.S.C. § 2401(b). Because Richard Deegan failed to file suit against the United States within six months of the denial of his administrative claim, the plaintiffs cannot use his claim to relate back to because it is a nullity.

**B.    Massachusetts Law Does Not Allow A Voluntary Administrator To File A Wrongful Death Claim.**

The plaintiffs' claim cannot relate back to Richard Deegan's claim for yet another reason:  it was defective because he lacked the authority to assert the claim.

Richard Deegan filed an administrative claim as a voluntary administrator.  *See* Opposition, Exh. D.  However, as held by the Supreme Judicial Court of Massachusetts, "a voluntary administrat[or] . . . possesses *no* authority to bring a wrongful death claim, or to settle one."  *Marco v. Green*, 415 Mass 732, 739, 615 N.E. 2d 928 (emphasis added).  In *Marco*, the court discussed G.L. c. 193, § 16, which delineates the circumstances in which a designated person voluntarily may undertake, without appointment by a court, to administer an estate.  A voluntary administrator may administer an estate consisting entirely of personal property not exceeding $15,000 in value. *Id.* at 736.  The statute requires that the voluntary administrator file a statement verified by oath or affirmation containing, among other things, the names and addresses known to the affiant of the persons who would take under the provisions of the intestacy statute, M.G.L.A. 190 § 3.  *Id.* at 737.  In the instant case, Edward "Teddy" Deegan's daughters, Ms. Patterson and Ms. Gioka, were not listed on the voluntary administrator's statement, even though they would take under the intestacy statute.[10]

According to *Marco,* "by its plain terms, § 16 provides that a voluntary administrator may receive payment of *only* those debts or obligations scheduled in the statutorily required statement."  *Id*. at 737.  A person may become a voluntary administrator without formal court approval and without providing a bond with sufficient sureties to guarantee the proper

---

[10]If there is no surviving spouse, property shall descend "[i]n equal shares to [the decedent's] children." M.G.L.A. 190 § 3.

10

performance of his trust.  Because of the "lack of accountability of a voluntary administrator, the Legislature explicitly has confined the applicability of § 16 to estates of limited value." *Id.* at 738.  The requirement that the voluntary administrator file a statement and administer only those assets and debts so itemized evinces a legislative intent to establish a mechanism whereby the use of § 16 is confined to its intended scope.  *Id.*  The court stated, "We would negate the letter and the spirit of § 16 if we concluded that a voluntary administrat[or] may compromise a wrongful death claim which is . . . not listed in the requisite statement." *Id.* Had the Legislature intended the voluntary administrator to act as legal representative for other purposes, it would have provided so *expressly*.  *Id.*   "The money recovered upon a wrongful death claim is not a general asset of the probate estate, but constitutes a statutory trust fund, held by the administrat[or] as trustee for distribution to the statutory beneficiaries." *Id*. at 739.

In the instant case, the claim brought by Richard Deegan is defective because the Massachusetts Legislature did not give him as voluntary administrator express authority to bring a wrongful death claim.  Had the Legislature intended to allow a voluntary administrator bring a wrongful death claim, it would have so provided in the plain language of the statute and it would not have limited the property to be administered to $15,000.

The Richard Deegan claim is defective for another reason.  It did not list the names and addresses of the plaintiffs as required by law.  The plaintiffs' names and addresses should have been listed on the voluntary administration form because they would take under the intestacy statute.  Additionally, the FTCA administrative claim was not listed in the requisite voluntary administer statement.

11

Although a claim based on death may be presented by the administrator or executor of the decedent's estate, or by any other person *entitled* to assert such a claim in accordance with applicable state law, 28 C.F.R. § 14.3(c)(emphasis added), such is not the case here.  Because this claim was brought by one who was not entitled to assert it under Massachusetts law, it does not fall within the FTCA's waiver of sovereign immunity.

**CONCLUSION**

Based on the foregoing, the United States respectfully requests that its motion to dismiss be granted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

 /s/Bridget Bailey Lipscomb
BRIDGET BAILEY LIPSCOMB
Trial Attorney, Torts Branch
Civil Division, U.S. Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C.  20044
(Phone) (202) 616-9356
(Fax) (202) 616-5200

Dated:  April 21, 2005                    Attorneys for the United States

**CERTIFICATE OF SERVICE**

I, Bridget Bailey Lipscomb, hereby certify that on April 21, 2005, I served a true copy of the United States' Reply To Plaintiffs' Opposition To Motion To Dismiss on:

Neil Rossman
Paul F. Denver
Rossman & Rossman
Marketplace Center - North
200 State Street
Boston, MA 02109

 /s/Bridget Bailey Lipscomb
BRIDGET BAILEY LIPSCOMB

13